# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TODD ABRAMS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 3:14-178 |
| ) | |
| ) | Judge Kim R. Gibson |
| CNB BANK, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

### I. Introduction

This matter comes before the Court upon a Motion for Summary Judgment filed by Defendant CNB Bank (ECF No. 29) pursuant to Federal Rule of Civil Procedure 56. Plaintiff Todd Abrams ("Abrams") has filed a response in opposition to CNB Bank's Rule 56 Motion. (ECF No. 36). For the reasons that follow, CNB Bank's Motion for Summary Judgment will be **DENIED**.

### II. Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1981, and 42 U.S.C. § 2000e-5(f)(3). Supplemental jurisdiction over Plaintiff's PHRA claims is predicated on 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391.

### III. Background

On June 29, 2009, CNB Bank hired Abrams, a member of the Jewish faith, as the bank's Director of Wealth Asset Management. (ECF No. 31 ¶ 1; ECF No. 38 ¶ 5). Abrams was interviewed and hired by Joseph Bowers ("Bowers"), the bank's President and CEO. (ECF No.

38 ¶¶ 3, 5). Abrams held that position until his termination on October 15, 2013, in the wake of a dispute between two employees in the Wealth Asset Management Department. (ECF No. 31 ¶¶ 2-3).

At the time that Abrams was hired, Bowers did not know that Abrams was Jewish. (Id. ¶ 5). However, at some point in 2010, Bowers allegedly phoned Abrams at home and asked if he was Jewish. (ECF No. 31 ¶ 56; ECF No. 43 ¶ 6). When Abrams answered in the affirmative, Bowers asked him to meet with a Jewish client of the bank in an attempt to strike up a relationship and produce business for the bank. (ECF No. 31 ¶ 56(a); ECF No. 38 ¶¶ 15, 21-22). Several years later, at an employee dinner at an Ohio pizza restaurant in April, 2013, Bowers commented on the unpleasant odor of "Hebrew" food and joked about how he found the hygienic habits of Jewish persons – in particular, Hasidic Jews – offensive. (ECF No. 31 ¶ 56(b); ECF No. 38 ¶¶ 40-42).[1] Abrams was offended by each of these incidents and began to suspect that Bowers did not like him because of his race and religion. (ECF No. 31 ¶ 59, 63-67). However, he did not raise either incident with the bank's Human Resources department. (ECF No. 38 ¶¶ 30, 48).

Throughout the majority of his employment at CNB Bank, Abrams was supervised by the bank's Senior Vice President of Operations, Vincent Turiano. (ECF No. 38 ¶ 3; ECF No. 31 ¶ 75). For each year that Abrams worked at the bank, Turiano conducted a performance evaluation, rating Abrams on a scale from 1 to 5 in a number of categories. (ECF No. 31 ¶¶ 76, 82, 87, 91). A score of 5 corresponded to an "outstanding" rating, with 4 being "very good," 3 being "good," 2 indicating "improvement needed," and 1 being "unsatisfactory." (ECF No. 38 ¶ 159). Abrams consistently received overall performance evaluations that fell into the "good" or

---

[1] CNB Bank disputes that these incidents occurred, but has agreed, exclusively for the purposes of this summary judgment motion, to accept those allegations as true. (ECF No. 31 ¶ 58).

"very good" category, and he never received a score in any individual category indicating that his performance needed improvement or was unsatisfactory. (ECF No. 38 ¶¶ 157, 159, 165, 182, 213).

In addition to providing numeric evaluation scores, Turiano typically made comments on Abrams' evaluations highlighting areas of strength and suggesting areas in which improvement might be made. For example, in 2010, Turiano commented that Abrams had a tendency to get sidetracked, needed to sharpen his knowledge of operations, and needed to "learn more about Human Resources policies as they relate to employee relations." (ECF No. 31 ¶ 76; ECF No. 38 ¶ 161). Turiano suggested that Abrams was too quick to suggest termination when confronted with a problematic employee. (ECF No. 31 ¶ 78). Turiano suggested that Abrams should instead go to Human Resources with employee issues and attempt to implement a course of action to cure the negative behavior. (Id. ¶ 79).

During Abrams' 2011 evaluation, Turiano indicated that Abrams needed to work on "creating a harmonious, positive work environment" within his department, adhering more closely to Human Resources policies, and improving his understanding of those policies. (ECF No. 31 ¶ 82; ECF No. 38 ¶ 166). Turiano's comments reflected concern within the bank about perceived "turmoil" and "negative" employee interactions in Abrams' department throughout the preceding year. (ECF No. 31 ¶ 83; ECF No. 38 ¶ 166).

In 2012, Turiano commented that Abrams needed to work on handling adverse situations with professionalism and needed to improve his understanding and clarity with respect to Human Resources policies. (ECF No. 31 ¶ 87). According to Turiano, these comments reflected that Abrams' department had continued to experience discord and turmoil and that Abrams still needed to improve his familiarity with Human Resources policies. (ECF No. 31 ¶¶ 89-90).

3

Nonetheless, Turiano did not rate Abrams lower than "good" in any category, and gave him an overall rating of "very good." (ECF No. 38 ¶ 182).

Despite his positive 2012 evaluation, Abrams received a critical memo from Bowers on October 29, 2012, stating that Abrams' performance evaluations reflected "continued instances of poor professionalism" and concerns as to communication and Human Resources functions. (ECF No. 31 ¶¶ 104-06; ECF No. 38 ¶¶ 191-92). Bowers met with Abrams and explained that Abrams' ability to handle subordinate staff was not his strong suit and that he needed to stay out of matters involving subordinate staff. (ECF No. 31 ¶ 107; ECF No. 38 ¶ 201).

In 2013, Turiano gave Abrams an overall rating of "good," but again suggested that Abrams needed to improve his department's "working environment." (ECF No. 38 ¶ 214). The day after the evaluation, Bowers sent another critical memo to Abrams outlining some positive contributions by Abrams, as well as the persisting negative issues affecting Abrams' department. (ECF No. 31 ¶¶ 110-11).

During the week leading up to Abrams' termination, a personal dispute arose between two employees in the Wealth Asset Management Department: Lea Peters, an administrative assistant, and Shawn Amblod, a financial advisor. (ECF No. 31 ¶¶ 4-5). Peters, a difficult employee whose evaluations consistently reflected performance issues, approached Abrams and complained that Amblod had treated her in a manner that was rude, condescending, and demeaning. (ECF No. 38 ¶¶ 53, 58-68). Abrams called a meeting to discuss those concerns on October 7, 2013. (ECF No. 31 ¶ 8; ECF No. 38 ¶¶79-80). The meeting was attended by Abrams, Peters, and Craig Ball, Amblod's direct supervisor, with Amblod participating by telephone. (Id. ¶ 9). Ball's notes from the meeting reflect that Peters had accused Amblod of behaving unprofessionally by refusing to return a client's phone calls. (ECF No. 38 ¶ 81).

Peters also produced an email sent to her by Amblod that she felt was rude and condescending. (ECF No. 38 ¶ 71). Amblod denied all of the accusations. (ECF No. 38 ¶ 81).

After the meeting had concluded, Peters remained in Abrams' office and reiterated her concerns about Amblod's treatment of his co-workers. She also revealed that she had overheard Amblod speaking abusively to his wife on the telephone. (ECF No. 31 ¶ 13; ECF No. 38 ¶ 85). Abrams called Ball back into his office and instructed him to take care of the problem between Amblod and Peters. (ECF No. 38 ¶ 88). Abrams then telephoned Amblod and relayed Peters' accusation that Amblod had been abusive to his wife over the telephone. (ECF No. 31 ¶ 19; ECF No. 38 ¶ 90).

Amblod promptly filed a report with Shannon Irwin ("Irwin"), an employee within the Human Resources department, accusing Peters of making slanderous comments about him. (ECF No. 31 ¶ 23; ECF No. 38 ¶ 92). The following day, October 8, 2013, Ball spoke with Human Resources and reported that he had been present at the meeting between Abrams, Amblod, and Peters, but that he had not been present when Peters accused Amblod of verbally abusing his wife. (ECF No. 31 ¶ 24-25; ECF No. 38 ¶ 93). Ball later opined that Abrams had thrown "gas on the fire" and turned the incident into a "giant mess" by relaying Peters' accusations directly to Amblod instead of going through Human Resources. (ECF No. 31 ¶ 30).

Abrams did not report any of Peters' allegations to Human Resources. (ECF No. 31 ¶ 18). He testified that he did not take the matter to Human Resources because he had previously reported other incidents concerning Peters, Amblod, and other employees to Human Resources and felt that nothing was ever done to correct those issues. (ECF No. 38 ¶¶ 120, 141, 234-36; ECF No. 31 ¶ 47).

On October 9, 2013, Mary Ann Conaway, the head of Human Resources for CNB Bank, returned from vacation and learned about the incident. ([ECF No. 31 ¶¶ 32-33](#)). Conaway discussed the incident with Turiano, and the two eventually spoke with Bowers. ([ECF No. 31 ¶ 39](#); [ECF No. 38 ¶¶ 260-61](#)). At a meeting with Bowers and Turiano on October 14, 2013, Conaway expressed her concern that Abrams had failed to raise the incident with Human Resources. ([ECF No. 31 ¶ 40](#); [ECF No. 38 ¶270](#)). Bowers instructed Turiano and Conaway to confirm the details of the incident with Abrams before making a disciplinary decision. ([ECF No. 31 ¶ 41](#); [ECF No. 38 ¶ 269](#)). Bowers, Turiano, and Conaway each acknowledged that they discussed the possibility of Abrams' termination at that meeting. Bowers Depo. ([ECF No. 32-5](#)) at 18; Conaway Depo. ([ECF No. 32-6](#)) at 40; Turiano Depo. ([ECF No. 32-4](#)) at 54.

On October 15, 2013, Abrams met with Turiano and Conaway to explain his version of the incident. ([ECF No. 31 ¶ 46](#)). Abrams confirmed that he had reported Peters' allegations of spousal abuse directly to Amblod and that he had not raised the incident with Human Resources because he felt that nothing would be done about it. ([Id. ¶¶ 46-47](#)). Abrams was then terminated based on "his failure to come forward with allegations of harassment." ([ECF No. 38 ¶ 270](#)). Neither Amblod nor Peters was terminated over the incident. ([ECF No. 31 ¶¶ 53-54](#)).

## IV. Standard of Review

Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial

under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

V.  **Discussion**

Abrams alleges that Defendant unlawfully terminated him on the basis of his race and religion in violation of Title VII of the Civil Rights Act of 1964, 29 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq*. Title VII's anti-discrimination provision, codified at 42 U.S.C. § 2000e-2(a), makes it unlawful

7

for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin …." 42 U.S.C. § 2000e-2(a).

The PHRA similarly declares it to be an "unlawful discriminatory practice" for an employer to discharge or otherwise discriminate against an individual "with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required." 43 Pa.C.S.A. § 955(a). Although the PHRA is a statute of independent force under Pennsylvania law, it has generally been construed to be coextensive with its federal counterparts. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). The provisions of the PHRA are typically construed to be coterminous with parallel federal anti-discrimination provisions unless a difference in the applicable statutory language indicates that a different construction is warranted. *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens …." 42 U.S.C. § 1981. The United States Court of Appeals for the Third Circuit has stated that, in the employment context, the "substantive elements" of a discrimination claim under § 1981 are "generally identical" to those of a discrimination claim under Title VII. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–182 (3d Cir. 2009).

Because the scope of protection provided under the PHRA and § 1981 is not materially different from that provided under Title VII, the Court's analysis of Abrams' Title VII claims will be similarly applicable to his claims under the PHRA and § 1981. Such claims are analyzed pursuant to the familiar three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004). Pursuant to this framework, a plaintiff must first make out a *prima facie* case of discrimination or retaliation. *Williams*, 380 F.3d at 761 (citing *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). If the plaintiff is successful, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for each challenged employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763-64 (3d Cir. 1994). Finally, the plaintiff bears the burden of demonstrating, by a preponderance of the evidence, that the defendant's articulated reason for the challenged action is a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804-05; *Bielich v. Johnson & Johnson, Inc.*, 6 F.Supp.3d 589, 605 (W.D. Pa. 2014).

In order to establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position that he held; (3) (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 1999). Here, CNB Bank does not challenge that Abrams is a member of a protected class, was qualified for the position that he held, and was subjected to an adverse employment action. Rather, CNB Bank maintains that Abrams was terminated entirely because of his failure to maintain a positive work environment within his department and his mishandling of the dispute between Peters and Amblod. CNB Bank contends that Abrams' documented history of

9

unfamiliarity with Human Resources policies and mismanagement of personnel matters both vitiates the fourth element of his *prima facie* case and serves as a legitimate, non-discriminatory justification for his termination.

Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas–Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). For present purposes, the Court will address the evidence adduced by Abrams in the context of pretext because his burden at the *prima facie* stage is "much less onerous than proving pretext with similar evidence." *Opsatnik v. Norfolk Southern Corp.*, 2008 WL 763745, at *4 (W.D. Pa. Mar. 20, 2008), *aff'd*, 335 F. App'x 220 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998)). *See also Moussa v. Penn. Dept. of Public Welfare*, 2010 WL 1333333, at *8 (W.D. Pa. Mar. 31, 2010) (analyzing the plaintiff's claims at the pretext stage where the defendant's *prima facie* and pretext-based arguments each relied on the same evidence).

In the instant case, CNB Bank's articulated reason for its decision to fire Abrams was that Abrams consistently displayed mediocre performance with respect to personnel matters and Human Resources issues, culminating in his mishandling of the October 7, 2013 dispute between Peters and Amblod. CNB Bank contends that Abrams, upon hearing a report that an employee had behaved abusively and disrespectfully, should have recognized the delicacy of the situation

and handled it by referring the matter to Human Resources instead of escalating the situation by conveying those accusations directly to the accused.

To defeat CNB Bank's motion for summary judgment, Abrams must point to some evidence that might cause a factfinder to either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). It is not enough to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.2d at 765). In other words, Abrams must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109. Abram may do so by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)) (internal citations omitted).

The evidence surrounding both Abrams job performance and the events that led to his termination is decidedly contradictory. As noted above, CNB Bank contends that Abrams consistently struggled to understand Human Resources policies and correctly apply them to disputes within his department. This alleged deficiency lead to frequent criticism by Turiano and Bowers during Abrams' tenure at the bank. (ECF No. 38 ¶¶ 161, 166, 177, 187, 190-92). One

of Abrams' subordinate managers, Ball, testified that much of the discord in the department could be attributed to Abrams' managerial style. (Id. ¶¶ 97).

Despite these criticisms, Abrams' performance reviews consistently indicated "good" or "very good" performance, both in terms of his overall performance and his performance within each individual category. During his four performance evaluations at CNB Bank, Abrams received overall scores of 3.4 ("good"), 3.5 ("good"), 4.0 ("very good"), and 3.7 ("good"). (ECF No. 38 ¶¶ 158, 165, 182, 213). In the areas in which Abrams allegedly underperformed, such as attitude, judgment, communication, interpersonal skills, and adherence to policies and procedures, Abrams never received a rating of "needs improvement" or "unsatisfactory," suggesting that his struggles in those facets of his employment were relatively minor. (Id. ¶¶ 165, 186, 188-89, 214, 220, 222, 224, 226, 227-28). Indeed, he never received a score lower than "good" in any category. (Id. ¶ 160). Based on this evidence, a jury could reasonably infer that, while attention to Human Resources policies might have been an area in which Abrams could have improved, his performance in that area was not critically deficient.

CNB Bank has also alleged that Abrams struggled to manage his employees and maintain harmony within his department. (ECF No. 38 ¶¶). However, there is conflicting evidence as to whether the discord in Abrams' department was attributable to his own managerial deficiencies. According to Abrams, his department was uniquely plagued with incorrigible employees who routinely created workplace distractions and personal conflicts. Peters, in particular, routinely received negative performance reviews (id. ¶¶ 60-67) and clashed with co-workers. (Id. ¶¶ 55-59, 68, 239). Abrams attempted to address the issues created by Peters and another troublesome employee, Kelly Fulton, by repeatedly raising them with Turiano and Conaway. (Id. ¶¶ 113, 120, 138, 155, 234-36, 277-78). Both Turiano and Conaway acknowledged that Peters and

Fulton were troublesome employees. ([Id. ¶¶ 280-84](#)). However, CNB Bank did not accept Abrams' recommendation to terminate either employee or implement a discipline plan that Abrams felt would be effective. ([Id. ¶¶ 128, 138, 141, 180, 249](#)). Instead, Conaway dismissed Abrams' complaints as "petty" and complained that he was always bothering her with employee issues. ([Id. ¶¶ 281, 284](#)). Other managers employed by the bank were similarly unsuccessful when forced to deal with employees such as Peters and Fulton, but those managers were not terminated. ([Id. ¶¶ 145-47, 152-56, 283](#)). Based on this evidence, a jury could reasonably find that the turmoil within Abrams' department could be attributed to difficult employees and a lack of support from CNB Bank, rather than his own managerial incompetence.

There are also material issues of disputed fact with respect to the details surrounding Abrams' termination. First, although it appears that Bowers, the individual who allegedly made discriminatory comments about Jews in Abrams' presence only a few months prior, did not make the final decision to terminate Abrams, Conaway acknowledged that she and Turiano had discussed terminating Abrams with Bowers the day before his termination. She also indicated that the two derogatory reports written by Bowers played a role in that decision-making process. In light of the fact that the critical reports were authored by Bowers, the allegedly biased individual, a jury could reasonably infer that discriminatory bias played a role in his termination. *See*, *e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (holding that a "supervisor's biased report may remain a causal factor [in a termination decision] if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."). At a minimum, there is an issue of material fact

concerning the extent to which Bowers' allegedly biased reports influenced the termination decision.[2]

Finally, there is evidence in the record to suggest that the company was generally hesitant to terminate difficult employees. For example, Abrams was repeatedly rebuffed when he suggested terminating Peters, an employee whose performance reviews were consistently far worse than his own. (ECF No. 38 ¶¶ 68, 128, 138, 141, 180, 249). Abrams was even chastised by higher-ups for his own frequent attempts to terminate difficult employees. In such a culture, Abrams' own termination appears to be an outlier. When coupled with the discriminatory comments about "Hebrews" and Jews allegedly made by CNB Bank's President in Abrams' presence, a jury could potentially infer that Abrams' termination was the result discriminatory animus rather than his performance. (Id. ¶¶ 128, 138, 141, 180, 249).

## V. Conclusion

For the reasons set forth above, CN Bank's Motion for Summary Judgment (ECF No. 29) is denied. An appropriate order follows.

---

[2] As noted above, both of those reports contained criticisms of Abrams' job performance that are partially contradicted by Abrams' performance reviews, each of which indicated that his performance was consistently "good" or "very good" in all categories.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TODD ABRAMS,

        Plaintiff,

v.

CNB BANK,

        Defendant.

Civil Action No. 3:14-178

Judge Kim R. Gibson

## ORDER

AND NOW, this 22nd day of March, 2016, this matter coming before the Court on Defendant's Motion for Summary Judgment (ECF No. 29), **IT IS HEREBY ORDERED** that: Defendant's Motion is **DENIED**.

BY THE COURT:

/s/ Kim R. Gibson
Kim R. Gibson
United States District Judge